UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

ANTHONY RANCHARAN, Individually
and on Behalf of All Others Similarly
Situated,

                Plaintiffs,           1:10-cv-07580 (RMB) (FM)

           -against-

FAMILY DOLLAR STORES,
INC.,

               Defendant.

------------------------------------------------X

TANYA YOUNGBLOOD, JEAN
SAMUEL, and BEVIS THOMAS, on
behalf of themselves and all others
similarly situated,

                Plaintiffs,           09-cv-3176 (RMB) (FM)

           -against-

FAMILY DOLLAR STORES INC.,
FAMILY DOLLAR INC., FAMILY
DOLLAR STORES OF NEW YORK
INC., AND DOES 1 through 10,
inclusive,

               Defendants.

------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Seth R. Lesser
Fran L. Rudich
Michael J. Palitz
Mark W. Gaffney
**KLAFTER OLSEN & LESSER LLP**
Two International Drive, Suite 350
Rye Brook, New York 10573

Other Counsel Listed on Signature Page

## **TABLE OF CONTENTS**

PROCEDURAL HISTORY ................................................................................................ 2

STATEMENT OF FACTS ................................................................................................ 2

    A.   FD Store Operations, Hierarchy And Practices Are Uniform and SMs' Job  Duties
        Are Defined by Comprehensive Corporate Policies and Protocols ........................... 2

    B.   There Is A Uniform SM Job Description ................................................... 8

    C.   FD Maintains UniformTraining for All New York SMs ............................................. 8

    D.   FD SMs Are Subject To A Uniform Time-Keeping System and Work Rules ............. 9

    E.   FD SMs Have Uniform Primary Job Duties ................................................. 9

    F.   FD SMs Have Uniform Employee Compensation and Benefits ............................... 13

    G.   FD Classifies All SMs as Exempt Employees ............................................. 13

ARGUMENT ................................................................................................ 14

  I.   THE BACKGROUND LEGAL FRAMEWORK ............................................. 14

  II.  THE CLAIMS HERE SHOULD BE CERTIFIED ......................................... 15

    A.   The Rule 23 Standards and Considerations ............................................. 15

    B.   Plaintiffs Satisfy The Requirements of Rule 23 .......................................... 16

        1.   Rule 23(a)(1) Numerosity is Met .................................................. 16

        2.   Rule 23(a)(2) Commonality Is Met ............................................... 16

        3.   Plaintiffs' Claims Are Typical of the Class Claims ......................... 18

        4.   Plaintiffs Will Adequately Represent the Class .............................. 19

        5.   Rule 23(b)(3) Predominance and Superiority Are Met .................... 20

    C.   Common Questions Predominate ................................................... 20

    D.   Class Treatment Is Superior to Other Alternatives ...................................... 23

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases:**

*Adames v. Mitsubishi Bank, Ltd.*, 133 F.R.D. 82 (E.D.N.Y. 1989)................................ 24

*Alba v. Papa John's USA*, 2007 U.S. Dist. LEXIS 28079 (C.D. Cal. 2007) ................................ 23

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)................................ 20

*Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81 (S.D.N.Y. 2001) ........................ 16, 19

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir. 2000) ............................ 19

*Bolanos v. Norwegian Cruise Line Ltd.*, 212 F.R.D. 144 (S.D.N.Y. 2002) ................................ 19

*Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342 (N.D. Ga. 2002) ............................ 23

*Consol. Rail Corp. v. Town of Hyde Park*, 46 F.3d 473 (2d Cir. 1995) ........................................ 16

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008) ...................................... *passim*

*Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009)................................ 17

*Goldman v. RadioShack Corp.*, 2005 U.S. Dist. LEXIS 8742 (E.D. Pa. 2005)............................ 23

*Grace v. Family Dollar Stores, Inc.*, 2011 U.S. App. LEXIS 5800 (4th Cir. 2011) .................... 2

*Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968) .................................................. 23

*Grochowski v. Phoenix Constr.*, 318 F.3d 80 (2d Cir. 2003)................................ 22

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006) ........................................ 15

*Iglesias-Mendoza v. LaBelle Farm, Inc.*, 239 F.R.D. 363 (S.D.N.Y. 2007)................................ 17

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ................................ 15

*In re Novartis Wage & Hour Litig.*, 611 F.3d 141 (2d Cir. 2010)................................ 14, 15

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001)............................ 24

*Krzesniak v. Cedant Corp.*, 2007 U.S. Dist. LEXIS 47518 (N.D. Cal. 2007) .............................. 23

*Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997)................................ 15, 16, 18

*Morgan v. Family Dollar Stores, Inc.* 551 F.3d 1233 (11th Cir. 2008)............................ 2, 15, 23

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)................................................... *passim*

*Niemiec v. Ann Bendick Realty*, 2007 U.S. Dist. LEXIS 98840 (E.D.N.Y. 2007)........................ 16

*Padilla v. Maersk Line, Ltd.* ...................................................................... 15, 16

*Perkins v. So. New England Tel. Co.*, 669. F. Supp. 2d 211 (D. Conn. 2009) ........................ 16, 24

*Reich v. State of N.Y.*, 3 F.3d 581 (2d Cir. 1993)...................................................... 17

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993)...................................................... 19

*Scott v. Aetna Servs.*, 210 F.R.D. 261 (D. Conn. 2002) ................................................ 24

*Smellie v. Mount Sinai Hospital*, 2004 U.S. Dist. LEXIS 24006 (S.D.N.Y. 2004)........................ 16

*Stillman v. Staples, Inc.*, 2009 U.S. Dist. LEXIS 42247 (D.N.J. 2009)................................ 23

*Tierno v. Rite Aid Corp.*, 2006 U.S. Dist. LEXIS 71794 (N.D. Cal. 2006) ................................ 19

*Torres v. Gristedes Operating Co.*, 2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. 2009).................... 24

*Toure v. Central Parking Sys.*, 2007 U.S. Dist. LEXIS 74056 (S.D.N.Y. 2007)........................ 19

*Wang v. Chinese Daily News*, 231 F.R.D. 602 (C.D. Cal. 2005)...................................... 23

*Whiteway v. FedEx Kinko's Office & Print Servs.*, 2006 U.S. Dist. LEXIS 69193
   (N.D. Cal. 2006) .............................................................................. 23

*Willix v. Healthfirst, Inc.*, 2009 U.S. Dist. LEXIS 114818 (E.D.N.Y. 2009)............................ 16

**Statutes:**

29 U.S.C. § 207(a)(1)................................................................................ 14

29 U.S.C. § 216(b) ................................................................................ *passim*

New York Labor Law § 650 *et seq*……………………………………………………………*passim*

**Rules & Other Authorities:**

12 NYCRR § 142-2.2 .............................................................................. 14

29 C.F.R. § 541.700(a)............................................................................ 18

FED. R. CIV. P. 23 ................................................................................................................. *passim*

Plaintiffs, on behalf of themselves and current or former New York Family Dollar store managers ("SMs"), challenge Family Dollar's corporate policy of classifying all SMs as exempt from the overtime requirements of the New York Labor Law ("NYLL").  Family Dollar ("FD") requires its stores – to an extraordinary degree – to follow corporate-derived and promulgated policies.  Indeed, FD recently had a law firm perform a Fair Labor Standards Act ("FLSA") audit which concluded that regardless of the FD store in which a SM works, "the basic tasks that a Store Manager must perform to operate a store are the same . . . ."[1]  The proposed class is:

> All persons who have worked for Defendants as Store Managers in New York State at any time between April 2, 2003 to the entry of final judgment in this case (the "Class Period"), and who have not been paid all wages owed to them, including overtime premiums, in violation of the New York Labor Law (the "Class").

The Second Circuit addressed class certification for NYLL claims in *Myers v. Hertz Corp.*, 624 F.3d 537, 547-48 (2d Cir. 2010) ("*Hertz*").  In doing so, while it found the case before it not to warrant certification, it repeatedly (and almost emphatically) endorsed *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008), a case on behalf of a New York class of drugstore assistant store managers, as a properly certified misclassification case. *Myers*, 624 F.3d at 549-50.  Certification was appropriate in *Damassia*, *Hertz* explained, because the plaintiffs presented evidence that "tend[ed] to show that the plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria." *Id*. at 549.

This case is fundamentally the same as *Damassia* (in which below counsel represented the plaintiffs).  Like *Damassia*, this case involves corporately controlled retail establishments

---

[1]  FLSA Audit at FD-Rancharan-Youngblood-004811 ("FLSA Audit") (copy attached as Exhibit 1 to the Declaration of Seth R. Lesser); *see also* Modla Deposition at 32 (Lesser Decl. Ex. 24). Lesser Declaration exhibits will be cited in the form "Ex. __", identifying the deponent.  Witness testimony will be cited by last name and relevant page number (*e.g.*, Modla (Ex. 24) at __). Citations to Bates-stamped documents will omit leading zeros. SMs whose depositions were divided into two portions will be cited as follows: (last name) 1 at __ & (last name) 2 at __.  In 2010, FD reclassified a SM at a store in Elbridge, New York as non-exempt based upon the store's sales volume.  Modla (Ex. 24) at 43.  This SM would not be in the Class.

with "comprehensive corporate procedures and policies" that largely defined SM's job duties. *Damassia*, 250 F.R.D. at 160.  Here, as in *Damassia*, such evidence is from the company's own documents, from the 29 depositions taken in the case, and here even by FD's own audit.  The evidence of FD's centrally derived and implemented control, and the manner in which SMs do materially the same set of duties and responsibilities, is, in actuality, well stronger than in *Damassia*.  A Rule 23 class will best address the propriety of FD's classification of SMs as exempt in a judicially efficient and economical manner.  *Id.* at 161; *Hertz*, 624 F.3d at 549.

## PROCEDURAL HISTORY

The present cases were filed following the Eleventh Circuit's decision in *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008), which upheld a collective action jury verdict on behalf of 1,424 opt-ins to a FLSA collective action.[2]  After a sojourn in the *In re: Family Dollar Stores, Inc.: Wage and Hour Employment Practices Litig.*, No. 08-MD-1932 (W.D.N.C.) MDL, until the MDL Judge *sua sponte* determined (and over FD's objections) that neither case should have been sent there because neither asserts federal FLSA claims, the JPML remanded them to this Court.  (*Rancharan* Docket No. 20).  As consolidated (*see Rancharan* Docket No. 35), class certification-specific discovery has led to the present motion.

## STATEMENT OF FACTS

**A.    FD Store Operations, Hierarchy And Practices Are Uniform and SMs' Job Duties Are Defined by Comprehensive Corporate Policies and Protocols**

FD is a retail chain that operates over 330 stores within New York.  Sullivan (Ex. 23) at 11; Ex. 70.  FD runs its stores through a hierarchical system and FD's centrally derived,

---

[2] FD may point to a recent affirmance of a grant of summary judgment as to an individual SM in *Grace v. Family Dollar Stores, Inc.*, 2011 U.S. App. LEXIS 5800 (4th Cir. Mar. 22, 2011).  That decision had to distinguish *Morgan* by stressing it was determined by the record which, it wrote, appeared to differ from *Morgan*'s.  *Id.* at *27-28.  The present motion is based on this case's record.

corporate-created guidelines apply at all New York stores.[3]  FD's business model mandates uniformity of store operations regardless of store location, size, staffing, or any other variable. The control level is almost startling:  there are corporate policies that are hundreds and hundreds of pages in length that dictate virtually every aspect of store operation from how merchandise is displayed to where on a SM's desk a stapler should be placed.[4]  Deviation from policies – even ministerial policies – subjects SMs to dismissal.[5]

Documents produced by the company, as corroborated by the testimony, demonstrate the hierarchical, standardized business practices through which FD maintains top-down control to ensure that each store operates the same way. As FD's Rule 30(b)(6) corporate representatives, Mr. Sullivan and Mr. Venberg, euphemistically termed them, there are "best practices" and "guidelines" expected to be followed in all stores.[6]  In actuality, the defining policy documents (which are actually called as such, and not called "guidelines") run, as noted, hundreds and hundreds of pages.  Even to list the areas of designated policies and controls would fill out the rest of this brief.  *See* Exs. 2, 3, 4, 5, 6, 7, 8, 9, 10, 19, 20, 67.

---

[3] Venberg (Ex. 25) at 54-59, 64-67, 75-77, 83, 92-100, 115, 118-19; Sullivan (Ex. 23) at 54, 92-94, 103-04, 107, 241; Gasperini (Ex. 28) at 46, 51, 86-88, 106-07, 147-49; Otero (Ex. 30) at 21, 94; Pierce 1 (Ex. 31) at 18, 33-36, 45-51, 55, 63-64, 94, 118; Spencer (Ex. 34) at 36; Klein 1 (Ex. 39) at 37; Youngblood (Ex. 52) at 184-85, 202-03, 214; Rancharan (Ex. 51) at 198-99; Allen (Ex. 41) at 20; Gray (Ex. 27) at 30-32, 45-63; Clegg (Ex. 29) at 24-27, 33-44, 57-60.

[4] Ex. 2, Strand 1: Customer Service, FD-MDL-10869; Ex. 3, Strand 2: Asset Protection, FD-MDL-10167, 10273-75; Ex. 4, Strand 3: Merchandising, FD-MDL-11806; Ex. 5, Strand 4: Career Development, FD-MDL-10466; Ex. 6, TEAM Development Series, Volume 1: Asset Protection, FD-MDL-12123; Ex. 7, TEAM Development Series, Volume 2: Career Development, FD-MDL-12661; Ex. 8, TEAM Development Series, Volume 2: Merchandising, FD-MDL-12918; Ex. 9, Store Policy Manual (February 2008), FD-MDL-9387; Ex. 19, Anytime 5 Program, FD-MDL-10165; Ex. 20, Every Store Visit Report, FD-MDL-11425; Ex. 67, 4 Firsts Workbook, FD-MDL-11990.

[5] Exs. 59, 68 (SM Ward Plummer terminated for failing to recover (i.e. clean and restock) the store according to Family Dollar policies); Otero (Ex. 30) at 17; Ex. 60; Ex. 61, Ex. 68.  *Accord also* Manowitz (Ex. 50) at 81-82, 142-43; Otero (Ex. 30) at 17; Plummer (Ex. 37) at 41-42, 49, 56; Bailey 1 (Ex. 35) at 75-76; Thomas (Ex. 53) at 442; Gasperini (Ex. 28) at 92-93; Gray (Ex. 27) at 65-68; Clegg (Ex. 29) at 63-64.

[6] Sullivan (Ex. 23) at 53, 121-22; Venberg (Ex. 25) at 59, 72, 79, 86-87.

For instance, the FD 4 Strands Program (later replaced by the TEAM Development Series in 2007 with essentially the same content) contains a set of corporate policy manuals for merchandising, asset management, career development, and customer service.  These policies provide SMs, "often in minute detail," directives about how to perform almost any task in a FD store.[7]  Thus the "Office Schematics" section of the 4 Strands establishes how the SM must arrange the office to ensure that "each store's office is standardized and follows company policy."[8]  FD even directs which items can be placed into each drawer of the office filing cabinet (e.g., Stamps must be placed in drawer 1, but Blank Deposit Logs must be in drawer 2) and which items can be placed on top of the office desktop (including pens, rubber bands, staplers, etc.).[9]  FD's policies even indicate why, when, and how to sweep the floor.[10]

Likewise, FD's "Merchandising Strand" and TEAM Development Series describe how products should be presented and priced in the store.  "All Family Dollar stores use Schematic layouts to achieve a consistent presentation throughout the Company."[11]  FD issues a monthly schematic for all New York stores based upon the stores' individual layouts and "[t]he store's Schematic layout determines where and how merchandise is organized in the store."[12]  FD's merchandising policies even have protocols for facing the products forward on the shelves.[13]  District Managers ("DMs"), the SMs' supervisors, evaluate SMs on the timely completion of and

---

[7] Ex. 1, FLSA Audit, at 4800, 4857.

[8] Ex. 12, Portion of Strand 2: Asset Protection, FD-MDL-10271.

[9] Ex. 13, Portion of Strand 2: Asset Protection, FD-MDL-10273-75; Ex. 6, TEAM, Asset Protection, FD-MDL-12259-60.

[10] Ex. 15, Portion of Strand 2: Asset Protection, FD-MDL-10184.

[11] Ex. 16, Portion of TEAM, Merchandising, FD-MDL-12922-23.

[12] Venberg (Ex. 25) at 78; Ex. 7, TEAM, Merchandising, FD-MDL-12923 and FD-MDL-12958.

[13] Venberg (Ex. 25) at 78; Ex. 7, TEAM, Merchandising, FD-MDL-12923, FD-MDL-12958, FD-MDL-12988.

compliance with store schematics and merchandising policies.[14]  SMs are disciplined for failing

to comply exactly with the schematics.[15]  SMs cannot deviate from the schematics or set their

own prices for the products in the store.[16]

FD controls all employee tasks.  Through the use of schematics, FD selects every product

sold in the store, how much to charge for those products, and where each product is placed on

shelves in the stores.[17]  SMs have no input at all into these decisions.[18]  Upon orders from

corporate headquarters, Regional Vice Presidents ("RVPs") instruct DMs about new policies and

tasks to be completed in the stores.  In turn, the DMs send checklists to SMs directing which

tasks must be completed on a daily and weekly basis.[19]  FD corporate headquarters also creates

each stores' "labor budget," allotting each store a set number of employee hours and dollars each

---

[14] Venberg (Ex. 25) at 78; Ex. 7, TEAM Merchandising, FD-MDL-12958, FD-MDL-12988; Ex. 16, Portion of TEAM, Merchandising, FD-MDL-12922-23; *see also* Gasperini (Ex. 28) at 38-39.

[15] Spencer (Ex. 34) at 35; Bailey 1 (Ex. 35) 26-28, 77-79; Lewis (Ex. 38) at 58.

[16] Jamali 1 (Ex. 43) at 30, 42-43; Manowitz (Ex. 50) at 78-79; Allen (Ex. 41) at 40; Otero (Ex. 30) at 23, 26, 66-67; Pierce 1 (Ex. 31) at 23, 30, 52, 67, 72; Smith (Ex. 55) at 19; Sorokey (Ex. 33) at 230; Spencer (Ex. 34) at 39, 58, 66-67; Thomas (Ex. 53) at 294, 300-02; Thompson 1 (Ex. 48) at 14-15; Klein 1 (Ex. 39) at 48-49, 70; Klein 2 (Ex. 40) at 223, 226; Plummer (Ex. 37) at 31-32, 46-49, 52-53, 65-66, 72; Lewis (Ex. 38) at 53-54, 58; Bailey 1 (Ex. 35) at 44; Bitkower (Ex. 42) at 29-30, 114-16, 119-20; Rancharan (Ex. 51) at 176-77; Leibert (Ex. 58) at 19-21.

[17] Sullivan (Ex. 23) at 65, 311-12, 316-17; Venberg (Ex. 25) at 78; Flyzik (Ex. 26) at 56-57, 62; Youngblood (Ex. 52) at 200, 204; Gasperini (Ex. 28) at 26, 37, 39-41, 146, 150-51; Bender (Ex. 47) at 9-14, 325.

[18] Gasperini (Ex. 28) at 26, 37, 146, 149-51; Jamali 1 (Ex. 43) at 30, 42-43; Allen (Ex. 41) at 40; Manowitz (Ex. 50) at 78-79; Otero (Ex. 30) at 22-24, 26, 38, 63, 65-68, 71-72, 76; Pierce 1 (Ex. 31) at 21, 23-24, 27, 30, 42, 46, 52, 65-68, 72, 74; Pierce 2 (Ex. 32) at 117, 218; Smith (Ex. 55) at 19; Sorokey (Ex. 33) at 212, 230-32; Thomas (Ex. 53) at 294, 300-02; Thompson (Ex. 48) at 14-15; Klein 1 (Ex. 39) at 48-49, 69-70, 74; Klein 2 (Ex. 50) at 202, 261, 268-69;  Spencer (Ex. 34) at 18, 38-39, 58; Plummer (Ex. 37) at 31-34, 51-52, 56, 64-65, 71-72; Lewis (Ex. 38) at 53-63; Bailey 1 (Ex. 35) at 36-37, 43-46, 62-66; Bitkower (Ex. 42) at 29-32, 114-16, 119-20; Youngblood (Ex. 52) at 200, 204.

[19] Jamali 1 (Ex. 43) at 71, 90-91; Manowitz (Ex. 50) at 82-86, 215, 318-19; Otero (Ex. 30) at 26; Pierce 1 (Ex. 31) at 26, 28-29; Samuel (Ex. 54) at 126, 265-69, 319-21; Spencer (Ex. 34) at 70-72, 198; Thomas (Ex. 53) at 41-42, 359-60; Thompson 2 (Ex. 49) at 58-59; Klein 2 (Ex. 40) at 32, 182-93; Lewis (Ex. 38) at 82-84; Bailey 2 (Ex. 36) 188-92; Bitkower (Ex. 42) at 37-38; Youngblood (Ex. 52) at 34-37, 42, 57-58, 170; Rancharan (Ex. 51) at 171, 227, 232, 344; Bender (Ex. 47) at 151.

week.[20]  Each store must utilize the corporate-provided labor budget and SMs cannot deviate from this budget.[21]  The DMs ensure that the SMs remain within the labor budget, and discipline any SM who exceeds the labor budget in a given week.[22]

Further illustrating the corporate control and uniformity is the fact that DMs and RVPs (and even the highest ranking executives like Mr. Sullivan and Mr. Venberg) routinely visit stores every week to ensure that all stores are meeting FD's corporate standards.[23]  It is the RVPs' and DMs' duties to perform these visits.[24]  DMs throughout New York complete the same store evaluations via corporate programs known as the "Every Store Visit" and the "Anytime 5 Program."[25]  The purpose of these visits is to ensure uniformity between the New York stores so that customers have the same shopping experience.[26] FD corporate also directs DMs to conduct weekly conference calls with all SMs in their district to discuss compliance with corporate

---

[20] Sullivan (Ex. 23) at 268-69, Flyzik (Ex. 26) at 146; Gasperini (Ex. 28) at 47-48, 114-15; Clegg (Ex. 29) at 106-07.

[21] Gasperini (Ex. 28) at 114-15; Jamali 1 (Ex. 43) at 48; Manowitz (Ex. 50) at 168-69; Otero (Ex. 30) at 50, 52, 80; Pierce 1 (Ex. 31) at 39, 56-57; Samuel (Ex. 54) at 90; Smith (Ex. 55) at 45-47; Sorokey (Ex. 33) at 240; Thomas (Ex. 53) at 227; Thompson 1 (Ex. 48) at 12; Flyzik (Ex. 26) at 146; Klein 1 (Ex. 39) at 87; Klein 2 (Ex. 40) at 58, 162; Spencer (Ex. 34) at 63; Plummer (Ex. 37) at 57-58, 274, 277-78; Lewis (Ex. 38) at 42-43; Bailey 1 (Ex. 35) at 46-47, 68-69; Bitkower (Ex. 42) at 70-73, 86, 89-90, 246; Youngblood (Ex. 52) at 66, 330-31; Rancharan (Ex. 51) at 120.

[22] Ex. 59 at 6300 (SM Ward Plummer fired for failing to remain within labor budget); Gasperini (Ex. 28) at 120-21; Klein 1 (Ex. 39) at 19; Lewis (Ex. 38) at 194-98; Thomas (Ex. 53) at 160, 300-02; Bitkower (Ex. 42) at 86; Youngblood (Ex. 52) at 330-31; Rancharan (Ex. 51) at 120.

[23] Ex. 2, Strand 1: Customer Service at FD-MDL-10951; Venberg (Ex. 25) at 100; Sullivan (Ex. 23) at 23; Clegg (Ex. 29) at 14; Gray (Ex. 27) at 16-17; Gasperini (Ex. 28) at 38-39, 46; Jamali 1 (Ex. 43) at 20, 70-71; Flyzik (Ex. 26) at 63-65; Klein 2 (Ex. 40) at 98; Plummer (Ex. 37) at 81-83, 327; Lewis (Ex. 38) at 265-71; Manowitz (Ex. 50) at 82-83; Bailey 1 (Ex. 35) at 82-83; Bailey 2 (Ex. 36) at 187-188; Samuel (Ex. 54) at 251-258; Thomas (Ex. 53) at 289; Thompson 1 (Ex. 48) at 20-21; Youngblood (Ex. 52) at 34-36; Bender (Ex. 47) at 214.

[24] Gray (Ex. 27) at 16-17; Clegg (Ex. 29) at 19-21.

[25] The Every Store Visit program replaced the Anytime 5 Program in 2009.  Sullivan (Ex. 23) at 251-52; Venberg (Ex. 25) at 114-15; Flyzik (Ex. 26) at 139; Gasperini (Ex. 28) at 38-39, 46.

[26] Ex. 16, Portion of TEAM, Merchandising, FD-MDL-12922; Exs. 18 & 19, Anytime 5 Policy.

policies.[27]  In addition to these calls and visits, DMs maintain close, if not daily, contact with the

SMs via e-mail and telephone to ensure obedience with Family Dollar's corporate standards.[28]

These standards are the same throughout New York.[29]  Individual stores also receive regular

communications from FD headquarters through e-mail and FD's corporate information

technology system (the "store portal").[30]  The store portal contains the same policies, training

modules, and procedures for all stores in New York.[31]

FD's New York stores are also governed by the Store Policy Manual.  The Manual is yet

another set of corporate policies that dictates uniform store standards.[32]  In short, from the

procedure for moving products from the stock room to the floor to the hours of operation to the

dress code, FD corporate controls all aspects of store operations.[33]

FD SMs confirmed the uniformity of store operations during their depositions. FD

corporate established the individual stores' labor budgets for each week, told SMs the rate of pay

for new hires, how to present and price the merchandise, where to place sales signs in the stores,

the hours of operation, and set the agenda for tasks to be performed each day or week.  SMs had

---

[27] Allen (Ex. 41) at 27; Smith (Ex. 55) at 120-21; Spencer (Ex. 34) at 72; Thomas (Ex. 53) at 294; Thompson 1 (Ex. 48) at 11-12; Plummer (Ex. 37) at 81-83, 327; Bailey 1 (Ex. 35) at 82; Rancharan (Ex. 51) at 111, 186.

[28] Sullivan (Ex. 23) at 97; Jamali 1 (Ex. 43) at 32-33, 70-71; Manowitz (Ex. 50) at 82-83; Allen (Ex. 41) at 15; Samuel (Ex. 54) at 251-58; Spencer (Ex. 34) at 72, 190-91, 198; Thomas (Ex. 53) at 40-41, 127-29, 289, 300-02; Klein 2 (Ex. 40) at 32; Plummer (Ex. 37) at 81-83, 327; Lewis (Ex. 38) at 82, 272-73; Bailey 1 (Ex. 35) at 82-83; Bailey 2 (Ex. 36) at 188-92; Youngblood (Ex. 52) at 34-36; Boyd 1 (Ex. 45) at 49-52; Rancharan (Ex. 51) at 186; Bender (Ex. 47) at 7-8, 24.

[29] Venberg (Ex. 25) at 54-56, 64, 66, 76-77, 83, 93-96, 100, 115, 118-19.

[30] Venberg (Ex. 25) 86-88; Sullivan (Ex. 23) at 103, 157.

[31] Venberg (Ex. 25) 86-88; Sullivan (Ex. 23) at 96, 103, 157.

[32] Venberg (Ex. 25) at 100; Flyzik (Ex. 26) at 101; *see* Ex. 9, Store Policy Manual.

[33] Venberg (Ex. 25) at 100; Flyzik (Ex. 26) at 63-65, 101; Gasperini (Ex. 28) at 125-26; Pierce 1 (Ex. 31) at 100; Spencer (Ex. 34) at 30, 53, 62-68; Plummer (Ex. 37) at 21-24, 63-64, 79-81, 87; Bailey 1 (Ex. 35) at 16-17, 45-46, 55-56, 66, 72-75; Allen (Ex. 41) at 27; Jamali 1 (Ex. 43) at 28-29, 42; Thompson 2 (Ex. 49) at 58-59; Smith (Ex. 55) at 95-96, 122; Thomas (Ex. 53) at 75, 150-51, 399; Samuel (Ex. 54) at 68-69; Bitkower (Ex. 42) at 139, 238-39; Youngblood (Ex. 52) at 200, 204-05; Rancharan (Ex. 51) at 198-99; *see* Ex. 9, Store Policy Manual.

absolutely no role in creating corporate policies as all policies came from corporate headquarters.[34]  Even the to-do lists from the DMs were generally based on the instructions sent from FD corporate headquarters.  As Kathleen Stanton, who was a Hancock, New York SM, testified, SMs' primary duty was "to mind the store" in accordance with corporate policies.[35]

FD also collects and maintains information on each store's performance.  FD utilizes this information to set the store and labor budgets and to determine sales goals and strategies for the individual stores in New York.[36]  SMs have no role in developing these strategies.

In sum, and not surprisingly for a nationwide retail chain that wants its customers to have the same experience in all its stores, FD's New York SMs operate under and pursuant to a demonstrable comprehensive corporate set of policies and procedures.

### B.    There Is A Uniform SM Job Description

FD corporate headquarters relies on a single written job description for all FD SMs.[37]

### C.    FD Maintains UniformTraining for All New York SMs

FD also maintains uniform training programs for SMs.[38]  The training materials were available in the 4 Strands until 2007, and are currently available in the TEAM Development

---

[34] Venberg (Ex. 25) at 54-56, 94-95, 128; Gasperini (Ex. 28) at 46, 51, 86-88, 106-07, 147-49; Otero (Ex. 30) at 20, 22, 24, 36-38, 40, 53, 72-73, 76; Pierce 1 (Ex. 31) at 18-28, 43-47, 51, 74, 82, 100-01, 129; Sorokey (Ex. 33) at 225, 227, 231-32, 235; Spencer (Ex. 34) at 23-25, 27, 38-41, 54, 58, 63; Klein 1 (Ex. 39) at 48-49, 69-70, 74, 87; Klein 2 (Ex. 40) at 58, 162, 261, 268-69; Plummer (Ex. 37) at 49, 51, 56-58, 72-75, 87; Lewis (Ex. 38) at 14, 41-42, 53-54, 58, 60-61, 175-80; Bailey 1 (Ex. 35) at 46, 66-75; Jamali 1 (Ex. 43) at 28; Samuel (Ex. 54) at  68-69; Manowitz (Ex. 50) at 93-95; Thompson 1 (Ex. 48) at 19-20; Smith (Ex. 55) at 36; Thomas (Ex. 53) at 87; Bitkower (Ex. 42) at 139.

[35] Stanton 1 (Ex. 56) at 29-30; *see also* Bitkower (Ex. 42) at 25, 256.

[36] Venberg (Ex. 25) at 78; Sullivan (Ex. 23) at 268-69; Flyzik (Ex. 26) at 146; Gasperini (Ex. 28) at 22-25, 107.

[37] Ex. 11, Job Descriptions, FD-MDL-9385 and FD-Rancharan-Youngblood-5050-5054.

[38] Sullivan (Ex. 23) at 52-54, 123, 128, 193-94; Venberg (Ex. 25) at 79-80 Gasperini (Ex. 28) at 52-55, 74-75; Klein 1 (Ex. 39) at 36; Samuel (Ex. 54) at 52; Smith (Ex. 55) at 36; Thomas (Ex. 53) at 71, 140-41; Rancharan (Ex. 51) at 91-98; Bender (Ex. 47) at 5, 101.

Series on the store portal.[39]   As discussed supra at 3-7, the training materials cover all aspects of store operations in minute detail.

### D.    FD SMs Are Subject To A Uniform Time-Keeping System and Work Rules

FD requires all SMs to use a uniform time-keeping system through the store's cash register.[40]   The work rules and procedures are likewise uniformly promulgated from FD headquarters through a centrally-managed store portal, and through the communications from DMs, RVPs, and corporate executives on store visits.[41]  FD promulgates the same company-wide Team Member Handbook (accessible though the corporate store portal), which maintains "behavioral expectations" for all FD employees.[42]   It is the responsibility of all FD team members to "read and comply with the provisions of the handbook."[43]

### E.    FD SMs Have Uniform Primary Job Duties

FD SMs have materially the same primary job duties.  For certification, as Judge Lynch recognized, it is not necessary to decide precisely how the mix of responsibilities is apportioned, but rather it be clear from the depositions and documents that the duties are largely consistent across store managers.  *Damassia*, 250 F.R.D. at 160.   This is true here.   Although FD's corporate representative, Mr. Sullivan, argued – in effect – that what SMs did each day might differ, he ultimately conceded that they have the same primary job duty:  "run a profitable store."[44]  As noted, there is a "Job Description" document setting forth the duties of SMs – from

---

[39] Sullivan (Ex. 23) at 101, 157, 160-61; Gasperini (Ex. 28) at 74-75; Clegg (Ex. 29) at 51-53.

[40] Ex. 21, Barry Sullivan E-Mail, FD-MDL-11414-15; Flyzik (Ex. 26) at 152.

[41] Sullivan (Ex. 23) at 97, 157, 160-161; Gasperini (Ex. 28) at 123-25; Allen (Ex. 41) at 20; Plummer (Ex. 37) at 38-39. 313-14; Lewis (Ex. 38) at 142, 206-08; Bailey 1 (Ex. 35) at 79-82; Manowitz (Ex. 50) at 81-82, 93, 142-43; Jamali 1 (Ex. 43) at 32-33, 70-71; Samuel (Ex. 54) at 251, 253-58; Thomas (Ex. 53) at 289, 294, 359; Smith (Ex. 55) at 95, 122; Thompson 1 (Ex. 48) at 20-21.

[42] Venberg (Ex. 25) at 125; Gasperini (Ex. 28) at 123-25.

[43] Ex. 10, Team Member Handbook, FD-Rancharan-Youngblood-3011.

[44] Sullivan (Ex. 23) at 220-21.

9

both "Essential Functions" to "Physical Requirements" – and explaining the various activities that constitute how a SM is responsible for "the overall daily operation of a store."  These range from what might be argued to be management functions (*e.g.*, "manages the store, its assets, and staff") to customer service (*e.g.*, greets customers) to merchandising/presentation (*e.g.*, displaying merchandise) to unloading the delivery truck to yet others, in substantial detail. [45] Particularly tellingly, the FLSA audit – which (astonishingly) litigation counsel here commented upon and reviewed[46] – had, ultimately (notwithstanding litigation counsel's review), to admit that irrespective of the type of FD store (whether Core, Urban, or Extreme Urban), "the basic tasks that a Store Manager must perform to operate a store are the same . . . ."[47]

Even aside from this telling concession, consistent with the FD job description and the FLSA Audit itself, the deposition testimony is clear that SMs spend their time performing the described job description tasks.[48]  The testimony of the SMs about their job duties is consistent to the other SMs throughout the state of New York.[49]  Although this is a merits matter and is not a certification issue, in fact, they spend the majority of their time engaged in manual labor and customer-service related tasks, including stocking merchandise on store shelves, counting

---

[45] Ex. 11, Job Descriptions, FD-MDL-9385 and FD-Rancharan-Youngblood-5050-5054.

[46] Modla (Ex. 24) at 153-55.

[47] Ex. 1, FLSA Audit, FD-Rancharan-Youngblood-4811.

[48] Allen (Ex. 41) at 8-16; Otero (Ex. 30) at 31, 35; Pierce 1 (Ex. 31) at 15, 35-38, 40, 43; Sorokey (Ex. 33) at 219-22; Spencer (Ex. 34) at 16-18, 20-27; Klein 1 (Ex. 39) at 96, 100-05, 130; Klein 2 (Ex. 40) at 24; Plummer (Ex. 37) at 19-20, 24-35, 205; Lewis (Ex. 38) at 14-19, 52-53, 66-67, 79, 84-87; Bailey 1 (Ex. 35) at 14-25; Jamali 1 (Ex. 43) at 23; Manowitz (Ex. 50) at 65-70, 103; Smith (Ex. 55) at 12-13; Thomas (Ex. 53) at 44-45; Thompson 1 (Ex. 48) at 15-16, 29-30; Bitkower (Ex. 42) at 21, 38, 41-45, 54, 57, 264-65; Youngblood (Ex. 52) at 215, 285-86, 309-10, 326-27, 344; Rancharan (Ex. 51) at 90, 180, 227, 232, 266, 269; Bender (Ex. 47) at 12-14, 25, 171, 179, 281-82; Leibert (Ex. 58) at 10-13.

[49] Spencer (Ex. 34) at 16-18, 20-22, 26-27; Klein 1 (Ex. 39) at 96, 100-05, 130; Klein 2 (Ex. 40) at 24; Plummer (Ex. 37) at 19-20, 24, 27-35, 205; Lewis (Ex. 38) at 14-19, 52-53, 79, 66-67, 84-87; Bailey 1 (Ex. 35) at 14-25; Jamali 1 (Ex. 43) at 23; Manowitz (Ex. 50) at 65-70, 103; Smith (Ex. 55) at 12-13; Thomas (Ex. 53) at 44-45; Thompson 1 (Ex. 48) at 15-16, 29-30; Bitkower (Ex. 42) at 21, 38, 41-45, 54, 57, 264-65.

money, loading and unloading trucks, taking out trash, cleaning the store and the store bathroom, moving products forward on the shelves, shoveling snow, helping customers, and operating the cash register.[50]  These are, paradigmatically, also tasks performed by hourly associates, and SM after SM testified that they primarily performed the same manual tasks as FD's non-exempt associates including, but not limited to, cleaning the store (dusting, mopping, sweeping), door-to-floor (receiving/unpacking freight, packing out merchandise), recovery, running the register and setting schematics.[51]  For instance, Clyde Pierce described himself as being like everybody else, rather than a SM, and indicated that he was doing the job of an associate.[52]

Further, SMs take substantial direction from their DMs, which limits the effective scope of their duties and responsibilities.[53]  DMs assign store workers, including other SMs, to perform daily tasks at stores including recovery (cleaning the store and organizing products on shelves).[54]

---

[50] *See* citations in note 48.

[51] *See* Lewis (Ex. 38) at 66-67; Bailey 1 (Ex. 35) at 41-42; Samuel (Ex. 54) at 430-31; Manowitz (Ex. 50) at 76-77, 98-101; Smith (Ex. 55) at 39-40; Bitkower (Ex. 42) at 9, 21, 38, 41-45, 54, 57, 264-65; Youngblood (Ex. 52) at 215, 285-88, 326-27, 309-10, 344; Rancharan (Ex. 51) at 90, 180, 227, 232, 266, 269; *see also* Ex. 1, FLSA Audit, at 4811; Allen (Ex. 41) at 8-16, 69; Otero (Ex. 30) at 93; Klein 2 (Ex. 40) at 72; Plummer (Ex. 37) at 198, 216-22, 280-81, 320; Lewis (Ex. 38) at 48-49, 175-80, 259-61; Bailey 1 (Ex. 35) at 25-26, 42-43, 84; Bailey 2 (Ex. 36) at 172; Jamali 1 (Ex. 43) at 23; Manowitz (Ex. 50) at 40-42, 49, 65-70, 103; Smith (Ex. 55) at 12-13; Thomas (Ex. 53) at 44-45; Thompson 1 (Ex. 48) at 15-16, 29-30; Bitkower (Ex. 42) at 21, 38, 41-45, 54, 57, 264-65; Youngblood (Ex. 52) at 285-86; Rancharan (Ex. 51) at 90, 180, 227, 232, 266, 269; Leibert (Ex. 58) at 24-25; Stanton (Ex. 56) at 55.

[52] Pierce 2 (Ex. 32) at 48, 50.

[53] Otero (Ex. 30) at 28-30; Pierce 1 (Ex. 31) at 92, 94; Spencer (Ex. 34) at 21, 72, 190-91, 198-99; Klein 2 (Ex. 40) at 32, 61, 79, 88, 182-83, 254-55; Plummer (Ex. 37) at 42-45, 77-83, 87, 192, 182-84, 327; Lewis (Ex. 38) at 23-24, 42-52, 80-84, 194-98, 272-73; Bailey 1 (Ex. 35) at 49, 79-84, 92-93; Bailey 2 (Ex. 36) at 188-92; Jamali 1 (Ex. 43) at 71, 90-91; Manowitz (Ex. 50) at 82-86, 215, 318-19; Samuel (Ex. 54) at 126, 265-69, 319-21; Smith (Ex. 55) at 122; Thomas (Ex. 53) at 41-42, 127-29, 300-02, 359-60; Thompson 1 (Ex. 48) at 20-21; Thompson 2 (Ex. 49) at 58-59; Youngblood (Ex. 52) at 34-37, 42, 57-58, 170, 209-10, 287, 315-18; Rancharan (Ex. 51) at 171, 176, 227, 232; Leibert (Ex. 58) at 9-10.

[54] Sullivan (Ex. 23) at 204; Klein 2 (Ex. 40) at 32; Spencer (Ex. 34) at 198; Bailey 1 (Ex. 35) at 92-93; Jamali 1 (Ex. 43) at 71, 90-91; Manowitz (Ex. 50) at 82-86, 215, 318-19; Samuel (Ex. 54) at 126, 265-69, 319-21; Smith (Ex. 55) at 122; Thomas (Ex. 53) at 41-42, 127-29, 300-02, 359-60; Thompson 1 (Ex. 48) at 20-21; Thompson 2 (Ex. 49) at 58-59; Bitkower (Ex. 42) at 25, 110,

SMs do not have independent discretion to make important decisions.  SMs do not decide what merchandise to order or to display on shelves, or to decide what items to put on sale.[55]  SMs do not regularly hire, promote, demote or fire employees, train, or raise or lower employee pay and do not regularly make recommendations about employment decisions, and their occasional recommendations are not given any particular weight.[56]  Evidence is clear that the DMs make the ultimate decisions in the FD stores and are leaders of the individual "Store Team."[57]

Finally, although why FD structured its stores the way it does is beyond the scope of the present motion, FD's labor budget depended on the sales volume of the stores.  When the labor budget decreased, fewer labor hours were apportioned to the stores which caused SMs to spend more time performing non-managerial tasks and doing more and more manual labor.[58]

---

139; Youngblood (Ex. 52) at 34-37, 42, 57-58, 170, 209-10, 287, 315-18; Rancharan (Ex. 51) at 171, 176, 186, 227, 232, 344; Bender (Ex. 47) at 7-8, 24, 214; Leibert (Ex. 58) at 10.

[55] Sullivan (Ex. 23) at 163, 311-17; Flyzik (Ex. 26) at 62; Allen (Ex. 41) at 8, 18, 39-40; Otero (Ex. 30) at 23, 26, 38, 65, 68, 71-72, 76; Pierce 1 (Ex. 31) at 23, 28, 46, 52, 65-68, 72, 74; Pierce 2 (Ex. 32) at 218; Sorokey (Ex. 33) at 225, 232; Spencer (Ex. 34) at 58, 64; Klein 1 (Ex. 39) at 69-70, 74; Klein 2 (Ex. 40) at 202, 261, 268-69; Plummer (Ex. 37) at 31-32, 51-52, 56, 64-65, 71-72; Lewis (Ex. 38) at 60-63, 77-79; Bailey 1 (Ex. 35) at 43-44, 62-63; Jamali 1 (Ex. 43) at 64-65; Thomas (Ex. 53) at 111; Manowitz (Ex. 50) at 60-61, 78-79, 345-48; Thompson 1 (Ex. 48) 14-15, 95-97; Thomas (Ex. 53) at 417, 422; Smith (Ex. 55) at 27-28; Bitkower (Ex. 42) at 32, 114-16, 119-20; Rancharan (Ex. 51) at 254, 279; Bender (Ex. 47) at 9, 11.

[56] Otero (Ex. 30) at 38-39, 48, 55, 60-62, 253; Pierce 1 (Ex. 31) at 47, 59, 60-64; Sorokey (Ex. 33) at 147; Spencer (Ex. 34) at 183-84, 220-21, 249-50; Klein 1 (Ex. 39) at 63, 65; Klein 2 (Ex. 40) at 65-68, 144, 197, 246, 251, 256; Plummer (Ex. 37) at 74-75, 182-84, 200, 251-52; Lewis (Ex. 38) at 32-37, 284; Bailey 1 (Ex. 35) at 47-55, 86-88; Bailey 2 (Ex. 36) at 249-50; Jamali 1 (Ex. 43) at 43, 49-50, 56-59, 69, 148; Samuel (Ex. 54) at 171-74, 214, 217-18, 341, 348-49, 436-37; Thomas (Ex. 53) at 227; Manowitz (Ex. 50) at 63, 311; Smith (Ex. 55) at 91-92, 164; Allen (Ex. 41) at 56; Bitkower (Ex. 42) at 59, 63-64; Youngblood (Ex. 52) at 23, 62-63, 100-04, 145-48, 166, 180, 268-69, 294, 304-05, 314; Rancharan (Ex. 51) at 245-46, 302, 306; Bender (Ex. 47) at 20, 172; Leibert (Ex. 58) at 17-19.

[57] Ex. 2, Strand 1: Customer Service, FD-MDL-10899; Otero  (Ex. 30) at 28-30; 251; Pierce 1 (Ex. 31) at 32, 34, 64, 92, 94; Pierce 2 (Ex. 32) at 48; Plummer (Ex. 37) at 87, 192; Bailey 1 (Ex. 35) at 49, 84; Thompson 2 (Ex. 49) at 45; Thomas (Ex. 53) at 147-48; Manowitz (Ex. 50) at 371-72; Bitkower (Ex. 42) at 25, 110; Leibert (Ex. 58) at 17-19.

[58] Gasperini (Ex. 28) at 120-21; Allen (Ex. 41) at 19, 33; Jamali 1 (Ex. 43) at 19, 23, 41; Thompson 2 (Ex. 48) at 31, 33-35; Bitkower (Ex. 42) at 86; Rancharan (Ex. 51) at 120, 188.

### F.    FD SMs Have Uniform Employee Compensation and Benefits

FD SMs are paid a fixed annual salary, and are expected to put in a 52-hour work week, often averaging 70 hours per week.[59]   SMs have the same vacation, holiday and sick time policies, and access to the same health insurance and 401K plans.[60]

### G.    FD Classifies All SMs as Exempt Employees

With one exception (*see* note 1), all New York SMs are classified as exempt.[61]   The decision to classify the SMs as exempt comes from corporate headquarters.[62]   The New York RVPs and DMs play no role in this classification decision.[63]   In classifying each SM as exempt, FD takes no account of the size of the store, the sales volume of the store, the location of the store, the shift the SM works, the SM's tenure with FD, the SM's experience in retail, or the DM that the SM works under.[64]   Although FD's 30(b)(6) witness fenced on this issue, he and all the RVPs deposed ultimately admitted that these factors were not material to determining a SM's

---

[59] Ex. 1, FLSA Audit, at 4859; Sullivan (Ex. 23) at 232; Flyzik (Ex. 26) at 136, 151, 159-60; Gasperini (Ex. 28) at 118; Otero (Ex. 30) at 11-13; Pierce 1 (Ex. 31) at 12-13, 31; Spencer (Ex. 34) at 103; Klein 1 (Ex. 39) at 25; Klein 2 (Ex. 40) at 39, 44; Plummer (Ex. 37) at 158-59; Lewis (Ex. 38) at 10; Bailey 1 (Ex. 35) at 23, 88-90; Jamali 1 (Ex. 43) at 16, 18; Samuel (Ex. 54) at 44-45; Manowitz (Ex. 50) at 27-28, 159; Thomas (Ex. 53) at 193, 198; Smith (Ex. 55) at 7; Thompson 1 (Ex. 48) at 12; Thompson 2 (Ex. 49) at 48; Bitkower (Ex. 42) at 15-16, 19; Youngblood (Ex. 52) at 26; Allen (Ex. 41) at 101, 104; Rancharan (Ex. 51) at 54, 56, 417, 420; Bender (Ex. 47) at 74; Leibert (Ex. 58) at 6.

[60] Ex. 69, Benefits Summary, FD-MDL-10465; Sullivan (Ex. 23) at 278-79; Flyzik (Ex. 26) at 190-93; Gray (Ex. 27) at 104-06; Gasperini (Ex. 28) at 141; Clegg (Ex. 29) at 132-35.

[61] Sullivan (Ex. 23) at 232; Modla (Ex. 24) at 43; Flyzik (Ex. 26) at 137, 157-60; Gray (Ex. 27) at 96-100; Gasperini (Ex. 28) at 127-31; Clegg (Ex. 29) at 123-26.

[62] Modla (Ex. 24) at 35; Gray (Ex. 27) at  96-99; Gasperini (Ex. 28) at 131-32; Clegg (Ex. 29) at 124-28.

[63] Modla (Ex. 24) at 35; Flyzik (Ex. 26) at 160-61; Gray (Ex. 27) at  96-99; Gasperini (Ex. 28) at 131-32; Clegg (Ex. 29) at 124-28.

[64] Modla (Ex. 24) at 35; Flyzik (Ex. 26) at 157-61; Gray (Ex. 27) at  96-99; Gasperini (Ex. 28) at 127-32; Clegg (Ex. 29) at 124-28.

classification.[65]   The policy is a unitary one.   There are no exceptions depending on what the SMs actually do.

During discovery, FD justified its position regarding the exemption status pointing to a 2010 FLSA audit prepared by the Morgan, Lewis and Bockius firm.   After interviewing only thirteen SMs out of the approximately 6,800 SMs nationwide, Morgan Lewis made a blanket determination – which FD accepted – that the SM position meets the exemption standard.[66]   Mr. Modla confirmed that this FLSA audit met the NYLL standard because the law is analogous, even though the audit interviewed only one New York SM about her job duties.[67]   The fact that FD believes it legally can sustain its position – and would use the audit to defend a case against as to its state of mind regarding the law – after interviewing only thirteen SMs is itself clear evidence that there are no material differences in the job duties performed by SMs to warrant different classifications.   In other words, a proper Rule 23 class exists.

## ARGUMENT

## I.   THE BACKGROUND LEGAL FRAMEWORK

The NYLL requires employers to pay employees a premium rate of one and one-half times their regular pay for hours worked in excess of 40 hours in a work week, unless they are exempt.   NYLL §§ 650 *et seq.*; 12 NYCRR § 142-2.2, *accord* 29 U.S.C. § 207(a)(1).   Both FLSA

---

[65] Modla (Ex. 24) at 40-44; 60-73; *see also* Flyzik (Ex. 26) at 157-61; Gray (Ex. 27) at  96-99; Gasperini (Ex. 28) at 127-32; Clegg (Ex. 29) at 124-28.

[66] Ex. 1, FLSA Audit, Appendix A at 5048-5049 (listing of 13 SMs interviewed for audit).

[67] Ex. 1, FLSA Audit, Appendix A at 5048-5049; Modla (Ex. 24) at 172-75, 207-08.  FD may rely on many clearly lawyer drafted declarations of *current* SMs to support its position that SMs should be exempt or that there exist differences relative to class certification.  Notably, many of these "happy camper" declarations are the same (with some paragraphs moved around and other minor wording changes).  As was stated in *Damassia*, however, this Court disfavors the use of declarations and favors deposition testimony.  *Damassia*, 250 F.R.D. at 159-60.  Nevertheless, as the Court will see should FD try to rely upon them, even the "happy camper" declarations reveal that SMs perform the same group of tasks.  In this brief, Plaintiffs rely solely on the deposition testimony and corporate documents.

and NYLL exemptions are narrowly construed.  *In re Novartis Wage & Hour Litig.*, 611 F.3d 141, 150 (2d Cir. 2010). Exemptions to NYLL overtime requirements are interpreted using the same standards as the FLSA.  12 NYCRR § 142-2.2; *Damassia*, 250 F.R.D. at 156 n.1.  FD claims to have classified all SMs as exempt under the executive and the administrative exemptions.  The burden will be on FD to prove that its classification was correct (*i.e.*, it is not Plaintiffs' burden to show that the classification was incorrect).  *In re Novartis*, 611 F.3d at 150; *Hertz*, 624 F.3d at 551; *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008).

## II.  <u>THE CLAIMS HERE SHOULD BE CERTIFIED</u>

### A.  The Rule 23 Standards and Considerations

Plaintiffs' NYLL claims are well suited for class certification. To certify a class, the "district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."  *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("*In re IPO*").  In determining whether a party has met each Rule 23 prong, the Court must "undertake a rigorous analysis," *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 225 (2d Cir. 2006), and "resolve[] factual disputes relevant to each Rule 23 requirement" even if there is an "overlap between a Rule 23 requirement and a merits issue."  *In re IPO,* 471 F.3d at 41; *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 448 (S.D.N.Y. 2010). District Courts should give Rule 23 a "liberal rather than restrictive construction," and "adopt a standard of flexibility."  *Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997).

As noted, guidance as to certification of a misclassification class was set out in *Hertz*. There, the Second Circuit endorsed Judge Lynch's *Damassia* decision where the plaintiffs presented evidence that "tend[ed] to show that the plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria" and that the job duties of class members were "largely consistent across the class."  624 F.3d at 549.  The evidence adduced here, as set forth

above, is stronger than what was the *Damassia* record.[68]   Specifically, it demonstrates what

Judge Lynch in *Damassia* considered crucial – a "comprehensive corporate [set of] procedures

and policies" dictating what SMs did.  *Damassia*, 250 F.R.D. at 160.  Yet other decisions of this

Court and within this Circuit (as well as many elsewhere, *see* pages 23-24, below) have certified

misclassification cases when the putative class was governed by overriding corporate policies.

*See, e.g.*, *Willix v. Healthfirst, Inc.*, 2009 U.S. Dist. LEXIS 114818 (E.D.N.Y. Dec. 4, 2009);

*Perkins v. So. New England Tel. Co.*, 669. F. Supp. 2d 211 (D. Conn. 2009); *Niemiec v. Ann*

*Bendick Realty*, 2007 U.S. Dist. LEXIS 98840 (E.D.N.Y. Mar. 30, 2007); *Smellie v. Mount Sinai*

*Hospital*, 2004 U.S. Dist. LEXIS 24006 (S.D.N.Y. Nov. 29, 2004); *Ansoumana v. Gristede's*

*Operating Corp.*, 201 F.R.D. 81 (S.D.N.Y. 2001).

### B.      Plaintiffs Satisfy The Requirements of Rule 23

#### 1.      Rule 23(a)(1) Numerosity is Met

Rule 23 (a)(1) "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v.*

*Town of Hyde Park*, 46 F.3d 473, 483 (2d Cir. 1995); *Padilla*, 271 F.R.D. at 448. FD employed

more than 1,500 SMs in New York during the class period, and numerosity is met.  *See* Ex. 66,

List of Putative Class Members, FD-Rancharan-Youngblood-4331-4374.

#### 2.      Rule 23(a)(2) Commonality Is Met

Rule 23(a)(2) requires there be "questions of law and fact common to the class." FED. R.

CIV. P. 23(a)(2).  Courts "liberally construe[] the commonality requirement." *Damassia*, 250

F.R.D. at 156 (citing authority), and it is a "minimal burden." *Padilla*, 271 F.R.D. at 448. "A

single common question may be sufficient to satisfy this rule." *Ansoumana*, 201 F.R.D. at 86;

---

[68] The evidence here also far exceeds that presented in *Hertz*.  There, although the Court affirmed a denial of class certification, it did so because the plaintiffs submitted hardly any evidence in support of certification.  *Hertz*, 624 F.3d at 549-50 (discussing how plaintiffs primarily relied on a single corporate deposition and, partially, on two other depositions that were equivocal).  This case is plainly not such a situation.

*see Marisol A.*, 126 F.3d at 376 ("*a common question* of law or of fact") (emphasis added). Commonality "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Damassia*, 250 F.R.D. at 156 (citation omitted).

FD's policy not to pay overtime compensation to SMs based on its uniform classification of them as exempt employees is the type of "unifying thread" that Rule 23 (a)(2) requires. *See Damassia*, 250 F.R.D. at 156 ("whether the class member is exempt from NYLL overtime requirements because he or she performs either 'executive' or 'administrative' duties" is a question of law common to all class members claims); *Iglesias-Mendoza v. LaBelle Farm, Inc.*, 239 F.R.D. 363, 371 (S.D.N.Y. 2007) (whether the NYLL and any exemptions apply is a common question). FD admits to this common policy – and it is one amenable to common proof.[69] Here, common questions include but are not limited to the following: (1) whether SMs are exempt from NYLL overtime requirements because they perform either "executive" or "administrative" duties, *see Damassia*, 250 F.R.D. at 156-57; (2) whether FD's classification decision to classify is excused by "good faith" and whether the decision was willful, *see id.*; (3) how SMs' work is to be characterized, whether "managerial," "administrative" or "production," *see, e.g., Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531-32 (2d Cir. 2009); *Reich v. State of N.Y.*, 3 F.3d 581, 587 (2d Cir. 1993) ("The district court relied upon this production/administrative dichotomy when it ruled that the Investigators were not exempt administrators. We agree."); and (4) what is the "primary duty" of SMs from FD's point of view, *see Damassia*, 250 F.R.D. at 157; *Reich*, 3 F.3d at 587 (determining the "primary function" of police investigators). Also among the common questions here is whether the relationship

---

[69] Modla (Ex. 24) at 58-73; Sullivan (Ex. 23) at 291; Flyzik (Ex. 26) at 136-37, 157-61; Gray (Ex. 27) at 96-99; Gasperini (Ex. 28) at 127-32; Clegg (Ex. 29) at 124-28.

between SMs' salaries and the wages paid to assistant store managers weighs against SMs' exempt classification. *See* 29 C.F.R. § 541.700(a) (setting forth a relationship criteria).[70]

Here, as in *Damassia*, a single FD document that does not vary from store to store sets forth the duties of the SM position and it sets out the categories of work for which SMs are responsible. Ex. 11, Job Descriptions, FD-MDL-009385 and FD-Rancharan-Youngblood-5050-5054. Facing a similar document in *Damassia*, Judge Lynch found that such a list of duties was "unquestionably probative" as to assistant store manager actual duties and "interpreting whether the duties described in this document are consistent with either the 'executive' or 'administrative' exceptions is a relevant question common to all class members." *Damassia*, 250 F.R.D. at 156-57. Here, there are also numerous other documents, as described, setting forth the many precise ways in which the store was to be run, documents that are likewise probative of actual duties and what SMs actually do on the job. *See* above, pages 2-7. Far from there being a common question, there are multiple common questions here.

### 3.  Plaintiffs' Claims Are Typical of the Class Claims

Rule 23 (a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23 (a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (citation omitted). Like commonality, typicality need not be complete. The class members' claims must simply arise from "the same course of events" and require "similar legal arguments

---

[70] For example, Clyde Pierce calculated that he made approximately $10.42 per hour when he was working 75-80 hours per week at the Pittsfield, New York store. The assistant store manager ("ASM") made $12.00 per hour. Pierce 1 (Ex. 31) at 96-97; *see also* Thompson 1 (Ex. 48) at 35-36 (complaining to DM that ASMs and third keys take home pay is higher than a SM's); Thomas (Ex. 53) at 210-11 (noting that a SM's pay essentially "balances out" with other store employees' pay since a SM works double the hours); Bitkower (Ex. 42) at 103-04 (stating that the one week he worked as an ASM he made more than he did as a SM).

to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

"Minor variations in the fact patterns underlying individual claims" do not defeat typicality when

the defendant directs "the same unlawful conduct" at the named Plaintiffs and the class.  *Id*.

Claims "only need to share the same essential characteristics, and need not be identical."

*Damassia*, 250 F.R.D. at 158 (citation omitted).   The typicality requirement is not "highly

demanding." *Id.*

Here, Plaintiffs' claims arise from the same course of conduct as do the claims of the

class – FD's classification of all SMs as exempt and its failure to pay them overtime

compensation.  *See Damassia*, 250 F.R.D at 158 ("all class members' claims, including those of

named plaintiffs, are based on the same course of events and legal theory, namely, that Duane

Reade's decision to classify its assistant managers as 'exempt' is inconsistent with the

requirements of the NYLL"); *Bolanos v. Norwegian Cruise Line Ltd*., 212 F.R.D. 144, 155

(S.D.N.Y. 2002) (finding typicality where all class members claimed they worked overtime but

were not paid for it); *Ansoumana*, 201 F.R.D. at 86-87, 96 (same), *see also Tierno v. Rite Aid

Corp.*, 2006 U.S. Dist. LEXIS 71794, at *7-8 (same) (N.D. Cal. 2006).  Typicality is thus met.

### 4.     Plaintiffs Will Adequately Represent the Class

Fed. R. Civ. P. 23(a)(4)'s adequacy inquiry has two parts, whether:  "1) plaintiff's

interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys

are qualified, experienced and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin &

Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

As to the first part, adequacy requires the class representatives to "have an interest in

vigorously pursuing the claims of the class."  *Toure v. Central Parking Sys.*, 2007 U.S. Dist.

LEXIS 74056, at *18-19 (S.D.N.Y. Sept. 28, 2007).  "The fact that plaintiffs' claims are typical

of the class is strong evidence that their interests are not antagonistic to those of the class; the

same strategies that will vindicate plaintiffs' claims will vindicate those of the class.  In addition, plaintiffs' attorneys are qualified to conduct the litigation." *Damassia*, 250 F.R.D. at 158.  Here, Plaintiffs Anthony Rancharan, Tanya Youngblood, Jean Samuel, and Bevis Thomas have demonstrated a commitment to the class by assisting with the preparation of the complaint, sitting for depositions, answering interrogatories, and producing documents.  Lesser Decl. at ¶ 72.  Plaintiffs' interests and the class's interests are not antagonistic.

As to the second part, Plaintiffs' attorneys have an extensive background and history of success in complex cases, including wage and hour cases, including, it so happens, *Damassia*. *See Damassia*, 250 F.R.D. at 165 (recognizing the Klafter Olsen & Lesser lawyers in this case as "experience[d] in handling wage and hour class actions and [having] knowledge of the applicable law" in being appointed class counsel) (case settled for $3.5 million).  *See also* Lesser Decl. at ¶ 63 & Exs. 62-65 (information relating to proposed class counsel).

### 5.       Rule 23(b)(3) Predominance and Superiority Are Met

Rule 23 (b)(3) requires that common issues not only be present, but "predominate over any questions affecting only individual class members and that a class action is superior to other methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3). This inquiry examines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

### C.    Common Questions Predominate

Like the plaintiffs in *Damassia*, Plaintiffs can demonstrate that the Court can adjudicate essential liability issues on a class-wide basis using generalized proof, and that doing so is necessary to achieve important efficiencies. The predominance requirement of Rule 23(b)(3) "is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if

these particular issues are more substantial than the issues subject only to individualized proof."
*Hertz*, 624 F.3d at 547.   In a misclassification case, plaintiffs will have to show "evidence
tending to show that the plaintiffs' jobs were similar in ways material to the establishment of the
exemption criteria." *Id.* at 549.

While in *Hertz*, the plaintiffs did not present enough evidence to meet this standard
(indeed, they practically presented no such evidence at all, *see id.* at 549-50), in *Damassia*,
Judge Lynch found for certification, as the Second Circuit approvingly wrote, that the
plaintiffs satisfied predominance by "demonstrating that the job duties of putative class
members were 'largely consistent' across the class and that individual differences in job
tasks would not be of the 'magnitude' to 'cause individual issues to predominate.'" *Hertz*,
624 F.3d at 549-50 (citing *Damassia*, 250 F.R.D. at 160).

The *Damassia* plaintiffs made this showing through various types of evidence that
reflected a fundamentally identical set of comprehensive corporate policies that directed what
ASMs did.  *See* 250 F.R.D. at 159.   Effectively and materially, each and every form of the same
evidence that Judge Lynch discussed and listed in *Damassia* has been presented here:

(1) a common job description, *see* page 8, above;

(2) a comprehensive set of protocols and materials guiding operations, *see* pages 3-8,
above;

(3) a common set of training and other materials establishing behavior of store level
employees, including SMs, *see* pages 8-9, above;

(4) admissions by the corporate designee, Family Dollar's RVPs, and even the FLSA
audit that the company commissioned (and which was even reviewed by litigation
counsel for this case and which, even after his edits, had to admit that) the duties and
responsibilities were the same in each store, *see* pages 9-12, above;[71]

---

[71] As Judge Lynch noted "[i]t is not possible (or necessary) at this stage to decide precisely how
the mix of responsibilities is apportioned, but it appears from the depositions to be **largely
consistent** across assistant managers."  *Damassia*, 250 F.R.D. at 160 (emphasis added).

(5) SMs who worked in multiple stores throughout New York corroborating that there is no variation in duties of or policies concerning SMs in various stores;[72]

(6) the company admitting that it does not consider any factors in categorizing SMs as exempt – *i.e.*, it considers all SMs exempt regardless of the store's size, location, etc., which "blanket determination" is "evidence that differences in the position, to the extent that there are any, are not material to the determination of whether the job is exempt from overtime requirements," *Damassia*, 250 F.R.D. at 159; and

(7) the testimony of the various SMs does not reveal material differences in the way in which they handle their job responsibilities – indeed, their testimony forms a largely (if not entirely) coherent whole in which they primarily handle non-exempt activities, *see* pages 9-12, above.

In short, the very same type and form of evidence that permitted Judge Lynch to conclude in *Damassia* that Duane Reade ASMs' NYLL claims could be heard on a class-wide basis exists here. *See Damassia*, 250 F.R.D. at 159-60. The present case thus falls squarely within the form of misclassification case appropriate for Rule 23 treatment:

> Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about "individualized" differences in job responsibilities.

*Damassia*, 250 F.R.D. at 160.[73]

---

[72] Venberg (Ex. 25) at 100; Gasperini (Ex. 28) at 38-39, 46, 86-88, 106-07; Otero (Ex. 30) at 21, 94; Pierce 1 (Ex. 31) at 18, 33, 35-36, 45-51, 55, 63-64, 94, 118; Samuel (Ex. 54) at 430-31; Manowitz (Ex. 50) at 101; Smith (Ex. 55) at 39; Thompson 1 (Ex. 48) at 33-36; Bitkower (Ex. 42) at 9; Youngblood (Ex. 52) at 184-85, 202-03, 214, 309-10; Allen (Ex. 41) at 5-6; Rancharan (Ex. 51) at 8, 11-13, 62, 69, 102, 113; Bender (Ex. 47) at 19-20.

[73] Moreover, the Court would have at its disposal many tools to handle any individualized issues that might arise. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001). Particularly in wage and hour cases, courts routinely rely on common evidence like job descriptions, expert testimony, surveys, sampling, statistical analysis and/or representative testimony. *See Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88 (2d Cir. 2003) ("[T]he plaintiffs correctly point out that not all employees need to testify in order to prove FLSA violations or recoup back wages, [but] the plaintiffs must present sufficient evidence for the jury to make a reasonable inference as to the number of hours worked by non-testifying employees."); *see also, e.g., Stillman v. Staples, Inc.*, 2009 U.S. Dist. LEXIS 42247, at *69-76 (D.N.J. May 15, 2009) (upholding jury verdict in misclassification collective action case against post-trial motions including motions asserting that individualized issues could not be tried on a representative basis where evidence at trial consisted of testimony of 13 collective action members out of 342, as

*Damassia* concluded by stating that, "[i]n sum, the record establishes that the responsibilities of assistant managers are derived and controlled by policies and protocols issued by Duane Reade, and do not vary materially from store to store." 250 F.R.D. at 161. The same is true here as well. *See also, e.g.*, *Family Dollar Stores, Inc.*, 551 F.3d at 1162-63 (affirming treatment of over 1,400 individual claimants as collective action because FD SMs found to perform the same non-managerial duties and to be subject to the same restrictive policies).[74]

### D.    Class Treatment Is Superior to Other Alternatives.

The second part of the Rule 23(b)(3) analysis examines whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968). Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to inquiry into superiority, including: whether individual class members wish to bring, or have already brought, individual actions; the

_____

well as corporate documentary evidence and corporate admissions); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1353 (N.D. Ga. 2002) (finding that a representative group of 25 department managers out of a FLSA collective of 300 was sufficient to allow a fair characterization of the job duties of the entire FLSA collective in denying defendant's motion for decertification). In addition to the four named Plaintiffs, Plaintiffs obtained deposition testimony from eighteen SMs throughout New York State. The evidence demonstrates that the SM job duties are largely consistent across the stores in New York.

[74] *See also Alba v. Papa John's USA*, 2007 U.S. Dist. LEXIS 28079, at *40 (C.D. Cal. Feb. 7, 2007) (questions whether store managers are properly classified as "exempt" and whether the standardized policies and practices throughout Defendant's stores prevent store managers from meeting the definition of "exempt" are common questions that are more appropriately addressed on a class-wide basis.); *Krzesniak v. Cedant Corp.*, 2007 U.S. Dist. LEXIS 47518, at *46-47 (N.D. Cal. June 20, 2007) (finding predominance based on legal questions of whether employer properly classified all managers as exempt); *Whiteway v. FedEx Kinko's Office & Print Servs.*, 2006 U.S. Dist. LEXIS 69193, at *28 (N.D. Cal. Sept. 14, 2006) (finding that question of overtime compensation of class of retail-chain managers predominated and that "[t]he Court can more efficiently answer the question of whether Defendant's exemption of all CMs is correct through a class action than through case-by-case adjudication."); *Goldman v. RadioShack Corp.*, 2005 U.S. Dist. LEXIS 8742, at *14 (E.D. Pa. May 10, 2005) (finding that whether "store managers were wrongfully classified as exempt and denied overtime wages" was a predominant legal issue); *Wang v. Chinese Daily News*, 231 F.R.D. 602, 613 (C.D. Cal. 2005) (finding predominance where plaintiffs alleged all class members classified as exempt from overtime pursuant to defendant's policy).

desirability of concentrating the litigation of the claims in the particular forum; and the difficulties of managing the case as a class action.   Denying class certification on manageability grounds is "disfavored" by the courts and "should be the exception rather than the rule."   *In re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d at 140.

Plaintiffs are unaware of any individual who is interested in "controlling the prosecution . . . of separate actions."   The cost of litigating individual claims would quickly be swallowed up by the costs of litigation, even though the recoveries may not be insignificant.   *See Perkins*, 669 F. Supp. 2d at 225.   Further, experience has shown that at least some current employees could be likely to refrain from filing individual claims due to fear of retaliation.   *Torres v. Gristedes Operating Co.*, 2006 U.S. Dist. LEXIS 74039, at *53-54 (S.D.N.Y. Sept. 26, 2009) ("since some class members are still employees of Defendants' class members may fear reprisal and would not be inclined to pursue individual claims."); *cf. Scott v. Aetna Servs.*, 210 F.R.D. 261, 267-68 (D. Conn. 2002); *Adames v. Mitsubishi Bank, Ltd.*, 133 F.R.D. 82, 89-90 (E.D.N.Y. 1989).

A class action is superior to litigating scores of individual claims without a class-wide liability inquiry.   Numerous individual actions would waste judicial resources and create the danger of conflicting outcomes.   Where, as here, there are questions of law and fact common to all employees of the class, it is more efficient to litigate the claims once.   *Torres*, 2006 U.S. Dist. LEXIS 74039, at *54 ("Given the question of law and fact common to class members, litigating in a common forum provides efficiency and a more suitable use of system resources than individual actions.").   It is certainly superior to the only real alternatives – effectively allowing FD's practices to continue unchecked or to have scores of individual actions.

## CONCLUSION

For all the reasons set forth above, Plaintiffs respectfully request that, pursuant to Federal Rules of Civil Procedure 23 (b) and (g), this Court certify the proposed class, designate the named Plaintiffs as Class Representatives, and designate Plaintiffs' counsel as Class Counsel.

Dated: Rye Brook, New York
      April 6, 2011

**KLAFTER OLSEN & LESSER LLP**

By: s/ Seth R. Lesser
Seth R. Lesser
Fran L. Rudich
Michael J. Palitz
Mark W. Gaffney
**KLAFTER OLSEN & LESSER LLP**
Two International Drive, Suite 350
Rye Brook, New York 10573
Tel: 914- 934-9200

Marc Hepworth
Charles Gershbaum
David Roth
Mat Parker
**HEPWORTH GERSHBAUM & ROTH, PLLC**
192 Lexington Avenue, Suite 802
New York, New York 10016
Tel: 212-545-1199

Robert E. DeRose
Katherine A. Stone
**BARKAN MEIZLISH HANDELMAN GOODIN DEROSE WENTZ LLP**
360 South Grant Avenue
Columbus, Ohio 43215
Tel: 614-221-4221

Robert Drexler
Shawn Khorrami
Elizabeth Hall
**KHORRAMI POLLARD & ABIR, LLP**
444 South Flower Street
33rd Floor
Los Angeles, California 90071
Tel: 213-596-6000

*Counsel for Plaintiffs*

25